**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0856-19T1

S.S.,[1]

    Plaintiff-Respondent,

v.

L.L.,

    Defendant-Appellant.

_____

> Argued November 17, 2020 – Decided December 7, 2020
>
> Before Judges Yannotti and Mawla.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FV-02-0109-20.
>
> Amanda F. Wolf argued the cause for appellant (Wolf Law, PC, attorneys; Robert W. Ruggieri, of counsel and on the brief; Amanda F. Wolf, on the brief).
>
> Ira C. Kaplan argued the cause for respondent.

PER CURIAM

---

[1] We use initials to protect the identities of the parties, pursuant to Rule 1:38-3(c)(12).

Defendant L.L. appeals from an October 11, 2019 final restraining order (FRO) entered in favor of plaintiff S.S. pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. We affirm.

Both parties are senior citizens; plaintiff was eighty-nine years of age and defendant seventy-eight when the FRO entered. Plaintiff suffered from various ailments and either utilized a walker or a wheelchair for mobility, whereas defendant enjoyed good health, ran, and played tennis. The parties had a two year relationship before deciding in June 2017, to live together in plaintiff's West Palm Beach, Florida home. However, one month after defendant moved in, plaintiff evicted him because he verbally abused her, and his conduct made her afraid. Defendant returned to reside with plaintiff in October 2017, as both sheltered together during a hurricane, but the relationship did not get better.

According to plaintiff's domestic violence complaint, filed on July 12, 2019, plaintiff's daughter flew to Florida to pack plaintiff's belongings and bring plaintiff to New Jersey because defendant's abusive conduct continued and despite having his own unit in the same development, he refused to vacate plaintiff's residence. On June 25, the day before plaintiff and her daughter were due to leave for New Jersey,

[defendant] woke [plaintiff] and began screaming at . . . [her]. . . . [He] was hostile and aggressive and got in [plaintiff's] face with closed fists and continued this all night[, defendant] called plaintiff profanities and degraded her and put her in fear . . . . While trying to leave the residence . . . [defendant] came out . . . and yelled profanities at . . . plaintiff[. Plaintiff] and her daughter . . . returned around 11:30 PM so [plaintiff] could use her lymphedema machine which pumps fluid out of her legs[.] While [plaintiff] was using the machine . . . [defendant] returned and was screaming again at . . . [plaintiff.] . . . A neighbor called the police and [the] Palm Beach County Sheriff's Dep[artment] arrived and took an incident report. [Plaintiff] and her daughter went to a neighbor's residence to stay and while walking away [defendant] began screaming at them and degrading [plaintiff] about being incontinent and embarrassing her in front of the neighbors[.]

The complaint described the prior history of domestic violence, including the August 2017 incident which caused plaintiff to evict defendant from her home and other "episodes of rage and screaming . . . [during which defendant] would raise his fists to [plaintiff]" which scared her. The complaint alleged plaintiff wanted to "come back to [New Jersey] because [defendant] was continually mentally and verbally abusive toward her [and although defendant] does not have any ownership of the home [he] would not leave so [plaintiff] had to leave to protect herself." Plaintiff sought a temporary restraining order (TRO) on grounds of harassment and terroristic threats.

A-0856-19T1

The court granted plaintiff a TRO on July 12. The TRO granted plaintiff exclusive possession of her Florida residence. Defendant was served with the TRO on July 15 and removed from plaintiff's residence. Self-represented, he filed a motion to modify the TRO provision regarding possession of the residence, which the trial judge heard on July 18.

During the July 18 proceeding, the trial judge asked defendant if he had a copy of the TRO. Defendant acknowledged service of the TRO, stating it was in his possession "for the past two days" and explained "[t]he nature of the application is not to rescind the entire [TRO]. . . . I realize that there is a final order proceeding coming up on the 22nd. It's to at least make a couple of amendments to the [TRO] . . . about the plaintiff's property . . . it's causing severe hardship here." The judge granted defendant's motion and vacated the provision granting plaintiff exclusive possession of the Florida residence because plaintiff was now in New Jersey.

During the hearing, plaintiff's daughter informed the judge defendant had violated the TRO by contacting the independent living facility in New Jersey where plaintiff was residing in an effort to reach plaintiff. The daughter advised that River Edge Police notified her the Palm Beach County Sheriff inadvertently provided defendant with plaintiff's address when plaintiff was served with the

A-0856-19T1

TRO and defendant used the address to call the residential facility. The trial judge therefore amended the TRO to include contempt.

At the conclusion of the hearing, the judge asked defendant if he planned to attend the FRO hearing, which was scheduled for July 22. Defendant advised "I'm working on it." Defendant asked the trial judge to expedite delivery of the amended TRO to the Palm Beach County Sheriff and gave the court his email address to serve him with the amended TRO.

Defendant retained an attorney who filed a motion to dismiss the amended TRO or, in the alternative, to transfer venue to Florida. Defendant substituted counsel who filed an August 2019 certification from defendant explaining that his motion was really one to dismiss for lack of personal jurisdiction. He certified he had not resided in New Jersey since 1995, "when [he] moved to Pennsylvania." He argued his only contact with New Jersey was "phone calls to [his] children and grandchildren that live in . . . New Jersey." He denied having any contact with plaintiff since June 25. Notably, defendant certified as follows: "I was initially served by the Palm Beach County Sheriff on or about July 15, 2019, with an envelope containing a single piece of paper which said 'Domestic Violence Restraining Order' but had no names on the paper, just a

A-0856-19T1

single address."[2]  Defendant claimed he later "received service of the [TRO] on or about . . . July 22 . . . via certified mail."

The trial judge heard defendant's motion in August 2019.  Plaintiff appeared with her counsel, and defendant's attorney also appeared but only for the purpose of contesting jurisdiction.  Citing <u>Shah v. Shah</u>[3], defendant's counsel argued that because the court lacked personal jurisdiction it could not enter an FRO.  Plaintiff's counsel argued the court had jurisdiction by virtue of defendant's contacts with New Jersey after being served with the TRO, resulting in the contempt.

The trial judge found the court had personal jurisdiction because

> after being served with . . . official paperwork from the State of New Jersey . . . [defendant] without any provocation by [p]laintiff call[ed] into where . . . [p]laintiff is residing[.]  I do find that his conduct in connection with the State [was] such that he could reasonably anticipate being [haled] into court after receiving those papers especially.

The FRO hearing occurred in October 2019.  Plaintiff testified and also adduced testimony from: her daughter; River Edge Borough Police officer Joseph Zemaites; West Palm Beach County Sheriff's deputy Lisa Benson and

---

[2]  The sheet of paper contained a portion of plaintiff's New Jersey address.

[3]  184 N.J. 125 (2005).

A-0856-19T1

Sergeant Ryan Mugridge; Gina Principato, the manager of the independent residential facility where plaintiff was residing in New Jersey, and Principato's assistant Maryanne Bova. Neither defendant nor his attorney appeared for trial.

The trial judge made detailed findings and concluded all of the witnesses were credible. Officer Benson testified she served defendant with the TRO on July 15. She described the interaction as follows:

> [I m]ade contact with him, advised him . . . why I was there, showed . . . [him] five pieces of paper and one that I keep that I sign saying I delivered it. Went over the nature of it.
>
> He advised me that he knew exactly what it was about, that he used to be an attorney . . . . I explained to him that this is why I'm here, I need him to understand the document and sign, which he did. He collected the other pieces of paper. I took the one that I needed[.]

Sergeant Mugridge testified he accompanied Officer Benson to serve defendant with the TRO. He recounted defendant

> was opposed to being served [with] the whole packet . . . . I explained to him if he was opposed to it or has any questions concerning the document to seek legal counsel.
>
> . . . .
>
> He said something along the lines of he was an attorney or he was handling it and that that was it. But he received the entire packet and then Deputy Benson and I left.

Plaintiff testified consistent with the allegations set forth in the amended TRO and the history of domestic violence. She noted she did not tell defendant where she was staying in New Jersey. She explained she needed an FRO because she feared further abuse from defendant who was younger and stronger than her. Plaintiff explained in detail why she was afraid of defendant because he had already violated the TRO and "[h]e doesn't care about the law at all. He thinks he is the law." She stated: "I'm eighty-nine going on ninety years old and I just want to be left alone."

Plaintiff's daughter corroborated plaintiff's testimony regarding the predicate acts which occurred in Florida. She also testified that, once in New Jersey, plaintiff was hospitalized because of "cellulitis of the legs" and while she was in the hospital with plaintiff, they learned of defendant's attempts to contact plaintiff at the residential facility in New Jersey. She testified her mother was worried and scared defendant would find her.

Bova testified she received a call on July 16, from a man who asked

> if I had a resident by the name of [S.S.] So, I said yes, we do. He said what type of facility is this. I said it's independent living. He said could you connect me to [S.S.'s] room then. I said no, this is an independent [living facility]. And then he asked me for her phone number and I said we don't have a resident's phone

A-0856-19T1

number here because it's independent living in their room.

Bova testified although the caller did not identify himself and the caller ID log was "unknown", the log did record the telephone number, which Bova recited. Plaintiff testified the number belonged to defendant.

Principato testified she received a call from an unknown caller on July 17 inquiring about plaintiff. The caller, also a male, told Principato he was a friend of plaintiff and asked if she was living there. Principato declined to answer the question and asked the caller for his name "several times" but "[h]e wouldn't tell me." She testified the caller said "I'm a friend of [plaintiff's], we've been living together for a long time as if we're married. I've been her primary caregiver. I've been taking care of her. . . . Her daughter . . . kidnapped her and took her away from . . . our home in Florida[.]" Principato testified she wrote down the telephone number of the caller, which was the same as the number Bova had, except for the last figure.

The judge found plaintiff proved defendant committed contempt pursuant to N.J.S.A. 2C:29-9(b), by knowingly and intentionally violating the TRO and harassment under N.J.S.A. 2C:33-4(c). Relating to the issues raised on this appeal, the judge credited Sergeant Mugridge and Officer Benson's testimony that defendant was served with the entire TRO and "told both officers . . . that

he had been an attorney so he understood what was happening." The judge noted she again listened to defendant's testimony from the July 18 motion and noted he "indicated that he had been served with a restraining order for the past two days . . . he understood that there was a [FRO] hearing scheduled" which corroborated the officers' testimony.

The judge concluded defendant was the person who called the independent living facility because he was served with the sheet containing plaintiff's confidential address, which was the same as plaintiff's independent living facility address. She found the unknown caller's telephone number was the same as defendant's and reasoned the slightly different number Principato provided was "merely inverted . . . when she recorded [the numbers]" and concluded defendant was the caller because he identified himself as plaintiff's friend, primary caregiver, and alleged plaintiff's daughter had kidnapped her.

The judge found defendant "was well aware that he was subject to restraints here in New Jersey and had been served with a copy of the restraining order when he made those telephone calls on July 16th and 17th to the staff at [plaintiff's] residence." She further found as follows:

> It was only after learning where [plaintiff] was that [defendant] reached out.
>
> . . . .

> The nature of those phone calls are, I find, incredibly concerning. They are . . . veiled in the idea that he's doing this in [plaintiff's] best interest when [plaintiff,] who can speak for herself, is saying to leave me alone. I find that those phone calls . . . after having been served with the restraining order convey on this [c]ourt personal jurisdiction over [defendant].
>
> . . . .
>
> After he was served [defendant] solicited this [c]ourt to amend the [TRO]. He filed an application. He convened the tribunal, so to speak, and called . . . plaintiff and the counsel on his application into court on the 18th. He made an application which I granted. I think he subjected himself to the personal jurisdiction of the court at that time.

The trial court's findings of fact are binding on appeal "if supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (citing Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). An appellate court may not set aside a trial court's factual findings unless convinced the findings "are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Ibid. (quoting Rova Farms, 65 N.J. at 484).

Moreover, an appellate court should defer to fact-finding by the Family Part because of that court's "special expertise in the field of domestic relations." Ibid. (citing Brennan v. Orban, 145 N.J. 282, 300-01 (1996)). However, we owe

11

no deference to the trial court's ruling on an issue of law, which we review de novo. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

On appeal, defendant argues the trial court erred in finding personal jurisdiction because the harassment and terroristic threats alleged in the TRO occurred in Florida and defendant lacked minimum contacts in order for New Jersey to exercise jurisdiction over him. Defendant argues the amended TRO was also deficient because it was based on unsworn statements of plaintiff's daughter and hearsay. He claims there is no evidence his calls were made with an intent to harass plaintiff or communicate terroristic threats. Defendant argues even if minimum contacts exist, it is unreasonable to expect him to defend the matter in New Jersey because the alleged domestic violence occurred in Florida and the witnesses are located there.

In Shah, our Supreme Court held our courts may issue a TRO where a victim of domestic violence flees into New Jersey as a result of domestic violence which occurred outside the state. 184 N.J. at 128. However, where no personal jurisdiction can be exercised over a defendant, our courts may not enter an FRO or grant relief that compels the out-of-state defendant to affirmatively act. Id. at 128-29.

A-0856-19T1

The Court explained

> [t]he analytical stricture [to determined personal jurisdiction] is straightforward. "The first step is to determine whether defendants have had the requisite minimum contacts with New Jersey. We evaluate the minimum contacts of a defendant on a case-by-case basis." . . . In so doing, we

> > focus on "the relationship among the defendant, the forum, and the litigation." The "minimum contacts" requirement is satisfied so long as the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff.

> > "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." The question is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."

> Once an examination of the defendant's minimum contacts with the State is complete, the policy question whether "the assertion of jurisdiction affect[s] traditional notions of fair play and substantial justice[,]" . . . must be addressed. That requires the consideration of a number of factors that comprise "the flip-side of the purposeful availment doctrine, [that is] whether the offending party could reasonably anticipate that the forum state would have a substantial interest in vindicating the personal rights of the injured party."

13

[Id. at 138-39 (citations omitted).]

With this as the backdrop, we turn to defendant's arguments. At the outset, we reject the assertion the court lacked jurisdiction when it entered the initial TRO. Defendant waived this argument when he filed a motion to amend the TRO, appeared on July 18, and advised the court he was not seeking to dismiss the TRO but instead to amend it to grant him access to the residence, and did not contest the court's jurisdiction.

We also reject defendant's argument the court lacked personal jurisdiction under the amended TRO. Section 4.5.3 of the State of New Jersey Domestic Violence Procedures Manual promulgated by the Supreme Court in conjunction with the Office of the Attorney General, Department of Law and Public Safety provides guidance regarding the taking of a domestic violence complaint and states: "At the initial hearing, the court . . . shall administer an oath to the applicant and take testimony regarding (a) the alleged domestic violence; . . . and (f) make general inquiry as to all relief requested by the applicant to determine the appropriateness of same."[4] Notably, elsewhere in the manual at

---

[4] https://www.judiciary.state.nj.us/courts/assets/family/dvprcman.pdf.

14

section 4.1.3 it states in taking an application for a TRO, the court "shall . . . amend the complaint to conform to the testimony, where appropriate[.]"[5]

It is true the trial judge did not take sworn testimony from plaintiff's daughter in order to amend the TRO to add contempt. However, a careful reading of the July 18 transcript reveals plaintiff, who was sworn at the outset of the proceedings, testified to defendant's contempt when she stated: "I don't know whether I'm safe or not because he has threatened me. He has called the police department, my daughter's police department, the police department where I currently reside. To inform them . . . that he's been extricated from his home." It was only later during the proceeding when plaintiff's daughter clarified that River Edge Police had called plaintiff to explain defendant had called the independent living facility that the judge realized plaintiff's earlier testimony was about defendant's contempt of the TRO and amended the TRO accordingly. Indeed, the judge briefly addressed the contempt by asking: "[Defendant] did not contact [plaintiff]; is that correct?" To which plaintiff

---

[5]  Ibid. Although section 4.1.3 addresses the municipal court procedure for hearing a TRO application we fail to see how the Family Part would be deprived of amending the complaint to conform to the testimony provided considering that the power to order such amendments, even at trial, is to be "liberally exercised." Pressler & Verniero, Current N.J. Court Rules, Cmt. R. 4:9-2 (2021).

responded "No." Therefore, the amended TRO was entered with the judge having relied on plaintiff's sworn testimony.

Challenging the addition of contempt to the TRO, defendant next argues as follows:

> Without any information about the substance of the calls, there is . . . simply [no] basis for asserting that the calls involved harassment or terroristic threats or any of the other sorts of communications that constitute domestic violence. In particular, there was absolutely nothing to suggest that the communications were even directed at [p]laintiff.

Contempt of a PDVA restraining order, N.J.S.A. 2C:29-9(b), is an independent predicate offense. N.J.S.A. 2C:25-19(a)(17). The contempt statute states: "a person is guilty of a crime of the fourth degree if that person purposely or knowingly violates any provision in an order entered under the provisions of the [PDVA] . . ." N.J.S.A. 2C:29-9(b)(1). Contempt is not a lesser included offense of either harassment, N.J.S.A. 2C:33-4(c) or terroristic threats, N.J.S.A. 2C:12-3, which have entirely different statutory elements. For these reasons, we reject defendant's argument the trial judge was required to find the telephone calls made to the independent residential facility contained threats or were harassing in order to amend the TRO to include contempt.

The court could assert personal jurisdiction over defendant based on plaintiff's testimony that defendant had called the residential facility in violation of the TRO. Furthermore, the judge's findings at the FRO hearing regarding defendant's contempt of the TRO are unassailable. Sergeant Mugridge and Officer Benson's testimony proved defendant was served with the entire TRO and defendant's testimony during the July 18 hearing further corroborated the officers' representations defendant had the TRO. Bova and Principato's testimony proved by a preponderance of the evidence that it was defendant who called the residential facility in violation of the TRO. Therefore, minimum contacts were established because defendant was aware he could not contact plaintiff, yet purposefully called the New Jersey residential facility in an attempt to reach her. Defendant's conduct was not "random", "fortuitous", or "attenuated" and he could reasonably expect to be "haled" into a New Jersey court for violating the TRO.

Finally, we reject defendant's argument that it would be a burden to defend plaintiff's claims in New Jersey. As the transcript of the FRO hearing readily proves, the judge was able to take telephonic testimony from the Florida officers and assess their credibility, and we see no reason why the judge could not do the

17

same with defendant, had he chosen to testify.[6]  Moreover, defendant was able to retain a New Jersey attorney to zealously represent his interests in the preliminary proceedings before the trial court and on this appeal.  Considering what plaintiff endured fleeing to safety in New Jersey and that in enacting the PDVA "the intent of the Legislature [was] to assure the victims of domestic violence the maximum protection from abuse the law can provide[,]" N.J.S.A. 2C:25-18, we are convinced New Jersey was the proper forum to vindicate her rights as a victim of domestic violence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[6] See also Pathri v. Kakarlamath, 462 N.J. Super. 208, 212, 216-21 (App. Div. 2020) (noting there is no prohibition on remote witness testimony under our Rules of Court and outlining the means by which try such a case.)